UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHRISTINE TIMMON,

        Plaintiff,

v.                                                          Case No.  5:05-CV-127

CAROL WOOD and                                HON. GORDON J. QUIST
SANDY ALLEN,

        Defendants.
_____/

CHRISTINE TIMMON,

        Plaintiff,

v.                                                          Consolidated with:

HAROLD LEEMAN and                          Case No. 5:06-CV-7
KATHY DUNBAR,

        Defendants.

_____/

## OPINION

In these consolidated cases, Plaintiff, Christine Timmon ("Timmon"), proceeding pro se, has sued various members of the Lansing, Michigan City Council.[1] In Case No. 5:05-CV-127, Timmon sues Defendants Carol Wood ("Wood") and Sandy Allen ("Allen") based upon events that occurred during the September 12, 2005, City Council meeting.  In Case No. 5:06-CV-7, Timmon sues Defendants Harold Leeman ("Leeman") and Kathy Dunbar ("Dunbar") based upon events that occurred during the January 5, 2006, City Council meeting.  Timmon alleges that Defendants are

---

[1]Timmon filed Case No. 5:05-CV-127 on September 15, 2005, and she filed Case No. 5:06-CV-7 on January 11, 2006.  In the March 13, 2006, Case Management Order in Case No. 5:06-CV-7, Magistrate Judge Scoville granted Defendants' motion to consolidate that case with the earlier-filed case.  On May 12, 2006, Chief Judge Bell entered Administrative Order No. 06-042, which reassigned Case No. 5:06-CV-7 to the undersigned.

liable under 42 U.S.C. § 1983 for violating her First and Fourteenth Amendment rights. Timmon also alleges a state law claim for violation of the Open Meetings Act, M.C.L. §§ 15.261 - .275. Finally, in Case No. 5:05-CV-127, Timmon alleges that Defendants Wood and Allen violated 18 U.S.C. §§ 241 and 242. Presently before the Court are Timmon's motions for summary judgment and Defendants' counter-motions for summary judgment. For the reasons set forth below, the Court will deny Timmon's motions, grant Defendants' motions, and dismiss the cases with prejudice.

## I. <u>Facts</u>

Timmon, an African-American, is a resident of the City of Lansing (the "City"). Timmon frequently attends meetings of the City Council and speaks during various segments of those meetings, including the public comment segment. Timmon also has a television show on the City's public access television channel operated by Comcast Corporation. At the time of the September 12, 2005, City Council meeting, Defendant Wood was an at-large member of the City Council and Defendant Allen was the President of the City Council. At the time of the January 6, 2006, City Council meeting, Defendant Dunbar was a newly-elected at-large member of the City Council and Defendant Leeman was the newly-elected President of the City Council.

The City has adopted rules that govern the procedures and conduct of City Council meetings. Rule 19, which covers decorum for meetings and rules for speakers, is quoted in full below.

> The presiding officer shall conduct Council meetings in an orderly manner. Members of Council and others in attendance shall obey directions of the presiding officer. Citizens attending Council meetings may have up to three opportunities to address Council. Speakers are requested to print their names and addresses on registration sheets to assist in the accuracy of the Council proceedings. Extensions of speaker time limits are permissible at the discretion of the Council. Opportunities to address Council are:
>
> (1)  *Public hearings*. Scheduled public hearings are held on specific legislative matters under consideration by Council. A three-minute time limit is imposed per speaker.

(2)    *Comment on legislative matters scheduled for action.*  Citizens may present facts and opinions on legislative matters (consent matters, resolutions and ordinances) listed on the Council agenda and on such late legislative matters as may be added to the agenda.  Each speaker is limited to three minutes total on legislative matters.

(3)    *Comment on communications, petitions, and other city related matters, including reports from Council Committees, City Officers, or Boards and Commissions.*  Citizens may speak on any City government related matter.  Each speaker is limited to three minutes total.  The presiding officer may rule any speaker out of order for failing to speak on City government related matters.

The purpose of the City Council meeting is to discuss City business and not to deal with individual personalities.  Consequently, during any City Council meeting, the City Council shall not permit a personally-abusive attack upon any person during debate or public discussion.  Nothing herein is intended to limit or restrain negative, positive or neutral comment about the manner in which an individual employee, officer, official or councilmember carries out his or her duties in public office or employment.

Conduct contrary to the normal presentation of business during a Council meeting which disturbs or interrupts the orderly process of the proceeding is a disturbance.  No speaker shall make any slanderous or profane remark which disturbs, disrupts or otherwise impedes the orderly conduct of any Council meeting.

No person in the audience at a Council meeting shall engage in disorderly conduct, including the utterance of threatening or abusive language, whistling or stomping of feet, or any other act which disturbs, disrupts, or otherwise impedes the orderly conduct of any council meeting or the presentation of any speaker.

(Ordinance 210.01, Rule 19, Defs.' Br. Supp. Ex. 2.)

**A.    September 12, 2005, Meeting**

The following facts are taken from the videotape of the September 12, 2005, City Council meeting, which Defendants submitted in support of their motion.  During the public comment on legislative matters portion of the meeting, Loren Glasscock, a former City police officer, addressed the City Council about the need to bring back the Lansing Police Department's community policing and school safety programs.  In particular, Mr. Glasscock related the positive experiences that he had with students as a result of his assignment to the school safety program during the early 1980s.

Several other speakers addressed the City Council and then Timmon was called to present her comments. Timmon first addressed Mr. Glasscock's comments about community policing. She generally expressed her view that police officers are not needed in the Lansing Public Schools. However, she stated that she was "listening to old school Loren Glasscock talking about police in the schools," and that Mr. Glasscock "needs to stay home." In addition, she stated that Mr. Glasscock was "deeply involved in the gassing of the Melling Forge UAW workers. . . . He needs to stay home."[2] Timmon then turned to an issue that Gary Andrews, who also hosts a show on the City's public access television channel, had raised at the prior City Council meeting held on September 8, 2005. Timmon stated that Mr. Andrews "made a lot of accusations against Comcast and the public access and some of the producers. Pay him no attention either." At this point, Defendant Wood interrupted Timmon asking for a point of order and stating "These are not public people. These are people . . . this is not the same as a council member or a public . . . And I request that we . . . are not making comments about private individuals." Defendant Allen then invoked Rule 19, stating that it "prohibits personally abusive attacks." Timmon responded that her attacks were not abusive and that she was only responding to Gary Andrews' comments at the prior meeting regarding Comcast. Timmon stated that she did not like Mr. Andrews' comments and that she "believe[d] there is a racial motivation in it from situations that have happened at that studio . . . involving certain people that come there and want to bother other people." Timmon continued, "And I will be filing some federal law suits. And Carol Wood, you need to mind your own business . . .

---

[2]In 1996, union employees of the Melling Forge Company went on strike at a plant in Lansing. In March of the following year, the employer brought in replacement workers. From that point on, Lansing police officers were present at the plant to ensure that the replacement workers could enter the plant without an incident involving the striking employees. During a union rally at the plant on May 29, 1997, police used tear gas to disperse protesters who were blocking egress from the plant. Various individuals, rally participants and residents in a nearby neighborhood, who were affected by the tear gas filed three lawsuits that were eventually consolidated before Judge Hillman in this district. Judge Hillman granted summary judgment to the defendants on December 16, 1998, and the Sixth Circuit affirmed in an unpublished opinion issued on February 10, 2000. See Ellsworth v. City of Lansing, No. 99-1045, 2000 WL 191836 (6th Cir. Feb. 10, 2000).

." Timmon also stated that she had "contacted [Mr. Kaltenbach] and told him that when he comes here, there's going to be some problems."[3]   Timmon continued with her comments regarding Comcast and her right to present a response until the buzzer indicating the end of the speaker's time went off.  However, Timmon continued speaking.  When someone in the audience spoke out of turn, Defendant Allen said, "This is enough," and Timmon left the podium.    After Timmon finished speaking, the City Clerk announced that she had stopped the timer when Defendant Wood asked for a point of order and made her comments, thus affording Timmon her full speaking time.

Shirley Carter, another African-American, spoke immediately after Timmon.  Ms. Carter thanked the City Council for invoking Rule 19 and stated that it should be used regularly to prevent personal attacks on speakers.  Ms. Carter noted that she had been subjected to personal attacks in the past.

**B.      January 5, 2006, Meeting**

The following facts are taken from the videotape of the January 5, 2006, City Council meeting, which Defendants submitted in support of their motion.  During the legislative matters portion of the meeting, several people commented on various topics.  Stan Shuck, the first speaker, addressed the importance of the City's unions as well as unions in general.  The second speaker, Dru Vinson, welcomed the new City Council members and spoke about new beginnings and his hope that the City Council would work together to do the right thing.  The third speaker, Melissa Sue Robinson, a candidate for state representative, spoke about the loss of tax revenue, the budget deficit and the need to have new employers and jobs in Michigan and Lansing.  The fourth speaker, Mia Tioli, spoke about starting a water taxi service in the City and the need for financing.  The fifth speaker, William Hubbell, stated that he disagreed with City Council meetings being held in the

---

[3]Mr. Kaltenbach apparently was a candidate for the City Council from the 4th ward.

afternoon rather than in the evening, the limit on public comment speakers to one time per session, and the City's failure to plow certain streets.  John Pollard, the Sixth speaker, stated that the City Council was in a six-month honeymoon period but after that time the members were subject to recall. He also expressed his concerns regarding the lack of diversity on the City Council; the fact that most of the elected members live in the 4th ward, have high incomes and expensive homes and are not representative of most of the residents of the City; and the fact many City department heads and appointed officials live outside of the City.  Pollard requested a list of department heads and the mayor's staff with their addresses and salaries, ethnicities, and genders.  Finally, Pollard commented about the City's deficit and questioned where the City would find the funds to pay former mayor Hollister in his new position to promote employment within the City.  After a brief response by some City Council members to Pollard's comments, Willy Williams, the seventh and final scheduled speaker, was allowed to speak.  He commented on the procedures that he believed the City Council should use for handling public comment speakers and quoted statements that Timmon made regarding the mayor, Dunbar, and the voters on one of her recent television shows.

When the scheduled speakers had spoken, City Council President Leeman asked if there were others who did not sign up to speak but who would like the opportunity to address the City Council. The first speaker, Darnell Oldham, welcomed the new members and commented on a breach of confidence and expressed his hope that the breach would be repaired.  Timmon then went to the podium to speak.  She started speaking without giving her address and was reminded to do so. Timmon congratulated Leeman on his election as City Council President and commented on the cost of "seating" the new mayor.  Echoing Pollard's comments, she stated that she did not like the fact that many of the department heads were "carpetbaggers" taking tax dollars out of the City, that the

6

mayor was "used to doing that" because he lived outside of the City, and that it was not worth it for the City to have paid such a large amount of money "for what it is not going to get." Timmon next commented that she would not let anyone get credit for projects that were initiated by the former mayor, Tony Benavides, and she stated that there was no need to fill the senate seat vacated by the current mayor several years ago. Timmon then engaged in the following exchange,[4] which is the basis for her complaint:

Timmon:     And also Chris Swope,[5] I've gotten very . . . a lot of complaints about you announcing . . . you violating the constitution of the State of Michigan by announcing at a public funded event that you had a husband. People were talking about you should have been ashamed of yourself [pounding of gavel] because [pounding of gavel] there was little kids . . . [City Council member asking for a point of order] Excuse me. Excuse me.

Leeman:     Point of order.

Timmon:     As long as you . . . you can talk about a person's duties as long as . . . . You can make a personal attack, as long as it is not unrelated to his duties. And this was related to the duties that he performs. This is related to the duties he performs.

Leeman:     There is a point of order. Please . . . please . . . please refrain . . . please refrain . . .

Timmon:     Stop the clock.

Leeman:     Please continue with other city matters.

Timmon:     Ok. Stop the clock and I'll check it with . . .

Leeman:     No. You go ahead, please.

_____

[4]Although the parties did not provide the Court with a transcript, the Court has reviewed Defendants' recitation of Timmon's comments in their brief and compared it to the video tape and finds it to be accurate. The Court thus incorporates herein the account of the exchange in Defendants' brief.

[5]Chris Swope was the newly-elected City Clerk.

Timmon:        Ok.  Now on Jerry Ambrose,[6] Jerry Ambrose, he is going to get it from me because I had to file injunctions against him when he was at the county commission concerning how money came up missing.  And Kathy Dunbar, just like I said, I will never trust a thing she says.  I don't think she belongs in these city matters.  She is a cheater insofar as her election [pounding of gavel] . . . .

Leeman:        [pounding of gavel] Please . . . please refrain from personal attacks.

Timmon:        Not when it's talking about their jobs.  The Open Meetings Act number 15 say a government body may impose sanctions on a personal attack of an official only if it is unrelated to their duties.  This is related to why she is sitting there.  Now . . .

Leeman:        Please continue with city matters.

Timmon:        That is a city matter.  I don't think she belongs sitting there.  I think her votes are _____ [buzzer for end of three minutes].

Leeman:        Thank you very much.

Three other speakers, Darrell Curtis, Darrell Burgess, and Gary Andrews, made comments after Timmon.  All three speakers commented on matters concerning the cable system and the lack of meetings of the City's Cable Advisory Board.

Timmon alleges in these cases that Defendants violated her First Amendment rights when they applied Rule 19 to her comments regarding Mr. Glasscock and Gary Andrews during the September 12, 2005, meeting and to her comments regarding Clerk Swope and Defendant Dunbar during the January 6, 2006, meeting.  Timmon also alleges that Defendants violated her Fourteenth Amendment rights by applying Rule 19 in a discriminatory manner and that Defendants violated the Michigan Open Meetings Act.

---

[6]Jerry Ambrose, who was formerly the Ingham County Controller, was Mayor Bernero's new chief of staff.

## II.  **Motion Standards**

Although Timmon brings her motions only under Rule 56, Defendants assert motions for judgment on the pleadings under Rule 12(c) and motions for summary judgment under rule 56.  The standard for a motion for judgment on the pleadings is the same as the standard for a motion to dismiss under Rule 12(b)(6).  See Morgan v. Church's Fried Chicken, 829 F.2d 10, 11 (6th Cir. 1987).  When ruling on a defendant's Rule 12(c) motion, a district court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief."  Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 512 (6th Cir. 2001) (citations omitted).  A complaint must contain "more than the bare assertion of legal conclusions," and it must contain "either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory."  Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995).  The motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  Id.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to

9

find for the non-moving party." <u>Agristor Financial Corp. v. Van Sickle</u>, 967 F.2d 233, 236 (6th Cir. 1992)(quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  <u>Discussion</u>

As noted above, Timmon and Defendants have filed motions for summary judgment.  The parties appear to agree that the videotapes submitted to the Court contain all of the evidence that is relevant and material to Timmon's claims in both cases and, therefore, there is no genuine issue of material fact.  Timmon asserts that she is entitled to summary judgment and requests an award of ten million dollars.  On the other hand, Defendants contend that they are entitled to summary judgment on all claims.  Specifically, Defendants argue that: (1) Timmon has failed to show a violation of her First Amendment rights; (2) Timmon's own evidence shows that Defendants did not apply Rule 19 in a discriminatory manner; (3) Defendants are entitled to absolute legislative immunity or qualified immunity; (4) Timmon's claims in Case No. 5:05-CV-127 based upon 18 U.S.C. §§ 241 and 242 must be dismissed because those statutes are criminal statutes which provide no basis for a civil claim; and (5) Timmon's claims under the Open Meetings Act fails because there was no violation.

### A.      **Section 1983 Claims**

In order to state a claim under § 1983, a plaintiff must allege that: (1) she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law.  See <u>United Food & Commercial Workers v. City of Sidney</u>, 364 F.3d 738, 746 (6th Cir. 2004) (citing <u>Moore v. City of Paducah</u>, 890 F.2d 831, 833-34 (6th Cir. 1989)).  There is no question in this case that Defendants were acting under color of state

law when they applied Rule 19 to Timmon during the September 12, 2005, and January 6, 2006, City Council meetings.  Therefore, the only question is whether they deprived Timmon of a constitutional right.

1.      **First Amendment Claim**

a.      **As Applied Challenge**

Timmon claims that Defendants violated her First Amendment rights by invoking Rule 19 to preclude her from rebutting the prior comments of Mr. Glasscock and Mr. Andrews during the September 12, 2005, meeting and by invoking Rule 19 to preclude her from commenting about Clerk Swope's conduct during a City-sponsored ceremony and her opinion of Dunbar's integrity during the January 6, 2006, meeting.

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This prohibition on governmental interference with free speech has been extended to state actors through the Fourteenth Amendment.  See Everson v. Bd. of Educ., 330 U.S. 1, 8, 67 S. Ct. 504, 508 (1947).  However, free speech rights must be balanced against the states' rights to protect important interests.  "The freedom of expression protected by the First Amendment is not inviolate; the Supreme Court has established that the First Amendment does not guarantee persons the right to communicate their views 'at all times or in any manner that may be desired.'" Jones v. Heyman 888 F.2d 1328, 1331 (11th Cir. 1989) (quoting Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981)).  A violation of the right to free speech occurs only when the restricted speech is constitutionally protected and the government's justification for the restriction is insufficient.  See Frisby v. Schultz, 487 U.S. 474, 479, 108 S. Ct. 2495, 2499-500 (1988).  Defendants do not argue,

11

and the Court finds no reason to conclude, that Timmon's speech during the public comment segments of the September 12, 2005, and January 6, 2006, meetings was not protected by the First Amendment.  Policing matters and the operation of City-sponsored cable television channels are matters of concern to the public entitled to First Amendment protection.  Similarly, a citizen's views on regarding the morality or legality of a public official's conduct or a public official's integrity are matters that implicate core First Amendment protection.

In order to determine the extent to which the government may impose limits on speech, the Supreme Court has adopted a forum analysis, which examines the character of the public property on which the speech occurs.  See id. at 479-80, 108 S. Ct. at 2500.  This analysis allows a court to determine "when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S. Ct. 3439, 3448 (1985).  The first type of forum is the traditional public forum, which includes places, such as streets and parks, that "by long tradition or by government fiat have been devoted to assembly and debate." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 954 (1983).  The second type of forum, referred to as a designated or limited public forum, see Spingola v. Vill. of Granville, 39 F. App'x 978, 982 (6th Cir. 2002) (noting that the second type of forum has been alternatively described as both a designated public forum and a limited public forum and citing Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 679, 118 S. Ct. 1633, 1642 (1998)), exists where the government designates  "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802, 105 S. Ct. at 3449.  The third type of forum, referred to as a nonpublic

forum, is "property which is not by tradition or designation a forum for public communication."

Perry Educ. Ass'n., 460 U.S. at 46, 103 S. Ct. at 955.  In traditional and designated public forums,

content-based restrictions are permissible only if they are narrowly drawn to serve compelling state

interests.  See id. at 45, 103 S. Ct. at 955; United Food & Commercial Workers, 364 F.3d at 746.

The government may impose a content-neutral regulation that restricts the time, place, and manner

of protected speech, so long as the regulation is "narrowly tailored to serve a significant government

interest, and leave[s] open ample alternative channels of communication."  Perry Educ. Ass'n, 460

U.S. at 45, 103 S. Ct. at 955.  When the property is a nonpublic forum, the government may impose

time, place, and manner restrictions and may restrict speech so long as the restriction is viewpoint-

neutral and is reasonable in light of the purpose of the forum.  See id. at 46, 103 S. Ct. at 955.

Courts have generally held that a limited public forum is created when a governmental body

opens its meeting to the public for comments.  See, e.g., Featherstone v. Columbus City Sch., 92 F.

App'x 279, 282 (6th Cir. 2004) ("A school board meeting, when opened to the public, is a limited

public forum for discussion of subjects relating to the operation of the schools."); Belcher v. City

of Poquoson, No. 90-2618, 1991 WL 87520, at *2 (4th Cir. May 29, 1991) (per curiam) (holding that

the portion of the city council meeting open to public comment on a subject of the speaker's choice

could be classified as a designated public forum); Schlegel v. Craft, No. Civ. A. 5:03-CV-268-R,

2005 WL 1949551, at *4 (W.D. Ky. Aug. 11, 2005) (concluding that a city council meeting open to

the public was a limited public forum); Jocham v. Tuscola County, 239 F. Supp. 2d 714, 728 (E.D.

Mich. 2003) ("A city council meeting is the quintessential limited public forum, especially when

citizen comments are restricted to a particular part of the meeting."); Zapach v. Dismuke, 134 F.

Supp. 2d 682, 690 (E.D. Pa. 2001) (concluding that a zoning board hearing regarding a developer's

appeal was a designated public forum for the purpose of obtaining public comment about the developer's request for a special exception). In a previous decision, this Court concluded that a meeting of a local municipal body constituted a limited public forum. See Gault v. City of Battle Creek, 73 F. Supp. 2d 811, 814 (W.D. Mich. 1999) (meetings of the Battle Creek City Commission).

Having concluded that the City Council meetings are a limited public forum, the Court must determine whether Rule 19 is content-based or content-neutral. A regulation that is justified without regard to the content of the speech is content-neutral, whereas a regulation that restricts speech on the basis of the message is content-based. See United Food & Commercial Workers, 364 F.3d at 752. "As long as a restriction 'serves purposes unrelated to the content of expression, it is content-neutral 'even if it has an incidental effect upon some speakers or messages but not others.'" Brown v. City of Jacksonville, No. 3:06-CV-122-J-20MMH, 2006 WL 385085, at *3 (M.D. Fla. Feb. 17, 2006) (quoting Zapach, 134 F. Supp. 2d at 690). The Court concludes that Rule 19, and in particular, the portion of the rule that prohibits personally-abusive attacks, is content neutral. The rule, on its face, applies to all citizens regardless of the message or viewpoint; it does take into consideration the content of the speech. Other courts have found similar city council rules to be content-neutral. For example, in Brown, supra, the court held that a rule prohibiting "personal, impertinent or slanderous remarks" to be content-neutral. See id. at *3. The court in Scroggins v. City of Topeka, 2 F. Supp. 2d 1362 (D. Kan. 1998), also found that a similar rule was content-neutral: "It is clear that the Council's prohibition on personal attacks is not based on the Council's disagreement with any particular message, is unrelated to any particular viewpoint being expressed, and serves purposes unrelated to the particular content of the speech." Id. at 1371; see also Rowe v. City of Cocoa, 358 F.3d 800, 802-03 (11th Cir. 2004) (concluding that the city council's rules of

14

procedure limiting citizen-speakers' comments to legitimate matters of public concern were content-neutral, served an important governmental interest in running an orderly and efficient meeting, and did not impermissibly restrict speech).

The Supreme Court and other courts have recognized that the government has a significant interest in the orderly and efficient conduct of meetings of public bodies. See, e.g., City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n, 429 U.S. 167, 175 n.8, 97 S. Ct. 421, 426 n.8 (1976) ("Plainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business."); Jones v. Heyman, 888 F.2d 1328, 1333 (11th Cir. 1989) (concluding that by limiting the plaintiff's comment to the topic at hand, the mayor was furthering the city's interest in controlling the agenda and preventing disruption of the meeting); Jocham, 239 F. Supp. 2d at 728 (noting that a county board "retain[s] substantial control over the manner in which citizen comments are presented"). In White v. City of Norwalk, 900 F.2d 1421 (9th Cir. 1990), the Ninth Circuit recognized that while a citizen has a substantial first amendment interest in addressing her local governmental body on matters of public importance, the government is not precluded from deciding the appropriate format for conducting the meeting. "[A] City Council meeting is still just that, a governmental process with a governmental purpose," and "[t]he Council has an agenda to be addressed and dealt with." Id. at 1425. Thus, the court noted, while the government may not stop a speaker because of her viewpoint, it may do so if the speaker becomes disruptive "by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies." Id. at 1425-26. The prohibition against personally-abusive attacks in Rule 19 furthers the City's interest in running an efficient meeting without disruption by ensuring that speakers focus only on the issues and not on impertinent matters. See Scroggins, 2 F. Supp. 2d at 1373 (stating that

15

"the rule against personal and slanderous remarks, like other rules of decorum, serves the important governmental interest of preventing disruptions to its meetings"). That is, the rule ensures that speakers who seek to use their allotted time before the City Council will do so to address public issues and not to air their personal disputes with others.

Timmon does not argue that Rule 19 is not narrowly tailored. [T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S. Ct. 2746, 2758 (1989) (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S. Ct. 2897, 2906 (1985)). The portion of Rule 19 prohibiting personally-abusive attacks satisfies this requirement by precluding only that activity that could be disruptive to the orderly conduct of the meeting.

Because Rule 19 serves a significant government interest and is narrowly tailored, Timmon must show that Defendants applied Rule 19 to her in a manner that was unconstitutional. See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 393, 113 S. Ct. 2141, 2147 (1993) (concluding that a constitutionally valid rule was applied in an unconstitutional manner). Timmon's argument on this point is essentially that Defendants' application of Rule 19 interfered with her free speech rights because they had no grounds to invoke the rule.

With regard to the September 12, 2005, meeting, Timmon maintains that she was only making a legitimate rebuttal to the comments by prior speakers and that she was not personally attacking them. However, the videotape shows that Defendant Wood asked for a point of order regarding the application of Rule 19's prohibition against personally-abusive attacks only after Timmon made personal and defamatory comments about Mr. Glasscock to the effect that he was "old school Loren Glasscock," that "he needs to stay home," and that he was deeply involved in the

16

gassing of Melling Forge workers.  Timmon's comments went well beyond the scope of any legitimate response to the issue that Mr. Glasscock raised regarding the need for police in the schools, and, on that basis, Wood reasonably inquired about the applicability of Rule 19 as Timmon was beginning her statement in response to  Mr. Andrews' comments about Comcast.  Nothing in the videotape suggests that Defendants invoked Rule 19 because they disagreed with Timmon's message or viewpoint.  Rather, Timmon had already finished her response to Mr. Glasscock's comments, and she was afforded her full speaking time to complete her comments about Comcast. Given these circumstances, Timmon has failed to show a First Amendment violation.[7]

Defendants' application of Rule 19 to Timmon's comments at the January 6, 2006, meeting presents a closer question, but the result is the same.  In a broad sense, Timmon's comments could be deemed to relate to matters of interest to the public.  For example, the issue of same-sex marriages has generated substantial controversy and debate in the last few years, including in Michigan, where voters recently approved an amendment to the Michigan constitution declaring that "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose."  Const. 1963, art 1. § 25.  If a City Council member or a City employee publicly took the position that the City should simply disregard the constitutional limitation and recognize same-sex marriages, or that the City should adopt an ordinance that would contravene the constitutional amendment by recognizing same-sex marriages, or that the City should provide domestic partner benefits, the member's or employee's views would certainly be a matter of public concern subject to negative or positive comment during the public comment portion of a City Council meeting.  However, Timmon's comments regarding Clerk Swope did not relate to a matter

---

[7]Timmon also alleges that during the September 12, 2005, meeting, Wood passed a note to Allen requesting that Timmon's rebuttal to Mr. Glasscock's comments be stopped.  Timmon has not produced the alleged note as part of her various filings, but even if she had done so, the alleged note would prove nothing because, as already noted, Timmon responded to Mr. Glasscock's comments without interruption.

of public concern, but rather to Clerk Swope's own personal life.  Specifically, as the Court understands it, at a City function, Clerk Swope introduced "his 'husband' whom he 'married' in a Canadian ceremony."  (Compl. ¶ 11.)  Timmon contends that her comments did not constitute a personal attack under Rule 19 because she was criticizing Clerk Swope's performance of his official duties.  Contrary to Timmon's suggestion, the fact that Clerk Swope was attending a City function does not transform his comments regarding his personal life into City business; Clerk Swope was not engaged in performing an official function of his office, nor was he advocating that the City should take any particular position regarding same-sex marriages.  In Gault v. City of Battle Creek, 73 F. Supp. 2d 811 (W.D. Mich. 1999), this Court held that the defendants violated the plaintiffs' First Amendment rights by refusing to let them speak on a matter of public concern at a city commission meeting.  Specifically, the plaintiffs sought to comment on the police chief's affair with an officer's wife and the police chief's cloning of the same officer's pager as indicators of the chief's fitness to serve as the head of the police department.  This Court, rejecting the defendants' argument that the affair was purely a personal matter that was unrelated to the chief's performance of his duties as police chief, noted that the chief's affair with his subordinate's wife "could directly relate to the morale, leadership, and teamwork of the Battle Creek Police Department and its officers."  Id at 815.  Similarly, this Court found that the allegation that the chief illegally cloned the officer's pager was a matter of public concern which the plaintiffs were entitled to address at the meeting.  Id. at 815-16.  There are no such circumstances in this case, because it cannot be reasonably said that Clerk Swope's comments have any bearing on his performance of his duties as City Clerk or suggest that he is unfit for the job.

Similarly, while Timmon's comments regarding Defendant Dunbar could, in a broad sense, be considered a matter of public concern, i.e., a public official's integrity, Timmon's reference to

Dunbar as a cheater based upon an unsubstantiated allegation of wrongdoing in connection with the November 2005 election constituted a defamatory remark that was unrelated to City business. That is, Timmon was not alleging that Dunbar had committed some impropriety in performing her duties as a member of the City Council nor does Timmon even suggest that her comments toward Dunbar had anything to do with Dunbar's performance of her duties on the City Council. Her comment was blatantly defamatory. Therefore, Defendants properly applied Rule 19 to restrain Timmon from continuing her personal attacks.

### b.      Facial Challenge

Although Timmon does not assert a facial challenge to Rule 19 in her various summary judgment briefs, because she is acting pro se, the Court will give her the benefit of the doubt and construe the following allegation in her complaint as a facial challenge:

> On its face, Rule 19 lacks clear and articulate standards which makes it arbitrary, and capricious in nature and substance. It is subject to biased interpretation which leads to violations of free speech and equal protection; and can be discriminatory in its application; and foster ambiguity.

(Compl. ¶ 22.) Although Timmon does not further elaborate on this allegation, the Court understands Timmon's argument to be that Rule 19 is unconstitutionally vague because it does not contain standards for determining whether a particular statement constitutes a personally abusive attack on someone. A law is unconstitutionally vague if it either denies fair notice of the standard of conduct for which a citizen is to be held accountable or if it is an unrestricted delegation of power such that it authorizes or encourages arbitrary enforcement. American-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 608-09 (6th Cir. 2005) (citing Leonardson v. City of E. Lansing, 896 F.2d 190, 196 (6th Cir. 1990)). In Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294 (1972), the Supreme Court explained:

Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms."

Id. at 108-09, 92 S. Ct. at 2298-99 (footnotes and citations omitted).

To the extent that Timmon claims that Rule 19 is unconstitutionally vague because it fails to provide any standards for application of the prohibition against personally-abusive attacks, the Court rejects the argument because the rule is sufficiently clear that a reasonable person can understand its meaning.  There is nothing unclear about the meaning of "personally-abusive attack"; that is, the rule prohibits insults, discourteous comments, or defamatory statements toward others.  This much is evident from the language that precedes the prohibition against personally-abusive attacks: "The purpose of the City Council meeting is to discuss City business and not to deal with individual personalities."  Moreover, the qualification that "nothing herein is intended to limit or restrain negative, positive or neutral comment about the manner in which an individual employee, officer, official or councilmember carries out his or her duties in public office or employment," makes clear that the rule against personally-abusive attacks is not meant to limit an individual's First Amendment right to speak about issues pertaining to the operation of the City government.  While Rule 19, like almost all other legislative enactments, could certainly be made more detailed (and complicated) by adding a set of precise and technical guidelines for determining whether a statement constitutes a personally-abusive attack, the Supreme Court made clear in Graynard that such lengths

are not required: "Condemned to the use of words, we can never expect mathematical certainty from our language." Id. at 110, 92 S. Ct. at 2300.

### 2.    Equal Protection Claim

Although it is not entirely clear from her complaints, as the Court understands it, Timmon is also claiming that Defendants violated her equal protection rights by allowing individuals who are Caucasian to rebut Timmon, while preventing Timmon from responding to Caucasian speakers, or by condoning personal attacks by Caucasian speakers.  (Case No. 5:05-CV0-127 Compl. ¶ 20 ("The people that Timmon rebutted who Wood was trying to protect are caucasian.  Timmon is the only African-American female with a newspaper, and television shows that expose the political wrong-doings of Wood's favored candidates and elected officials.  Whites have often went to the televised Lansing City Council podium and rebutted Timmon with no reprimand."); Case No. 5:06-CV-7 Compl. ¶ 10 ("Defendants, Leeman and Dunbar listened to the public comment of a white man who is intricately involved with the current case, (Docket No: 5:05-cv-127) and chose not to interrupt his public comment when he used language inappropriate for a limited public forum; and was not City of Lansing Business.")

The Equal Protection Clause requires government officials to treat similarly situated individuals in a similar manner.  See  U.S. Const. amend. XIV.  In order to establish a violation of the Equal Protection Clause based upon race, a plaintiff must prove that a racially discriminatory intent or purpose was a factor that influenced the governmental actor's decision or action.  See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66, 97 S. Ct. 555, 563 (1977).

> A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual.  "[T]he decision maker [must have] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

21

Huebschen v. Dep't of Health & Soc. Servs., 716 F.2d 1167, 1171 (7th Cir. 1983) (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979)).  A plaintiff may show that the decisionmaker acted with a discriminatory purpose by introducing evidence that similarly situated individuals of a different race were treated differently.  See Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 534 (6th Cir. 2002).  "A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was [treated differently] or through the use of statistical evidence or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Id. (quoting Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir. 2001).  In Gardenhire v. Schubert, 205 F.3d 303 (6th Cir. 2000), the Sixth Circuit stated that a plaintiff alleging an equal protection claim based upon selective enforcement must demonstrate three elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations.  Second, [the official] must initiate the prosecution with a discriminatory purpose.  Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

Id. at 319 (quoting United States v. Anderson, 923 F.2d 450, 453 (6th Cir. 1991)).

Timmon's equal protection claims fail because she has not presented any evidence that in invoking Rule 19, Defendants singled her out because of her race; that Defendants had a discriminatory purpose in invoking Rule 19; or that enforcement of Rule 19 against Timmon had a discriminatory effect on African-American members of the Lansing community.

Timmon's videotape evidence in Case No. 5:05-CV-127, which presents several excerpts from undated City Council meetings, fails to support a claim of selective prosecution.  The first speaker, Jim Williams, a Caucasian, commented in response to Timmon's attacks against gays during her public access television show.  As with Timmon, the City Council invoked Rule 19,

reminding Mr. Williams that the City Council meeting was not a forum to personally attack someone.  The next speaker was Frank S. Curtis X, an African-American, who used profanities and the derogatory term "nigger" in his comments.  The City Council did not interrupt his speech to invoke Rule 19, even though his comments were probably offensive to some people in attendance.  The third speaker was Gary Andrews, a Caucasian.  Mr. Andrews simply presented his views on Comcast and did not mention any individual by name.  The fourth speaker, Willy Williams, a Caucasian, spoke on two different occasions regarding local elections.  In the first instance, Mr. Williams stated that he would not support a candidate for City Clerk who aligned herself with Timmon.  In the second instance, Mr. Williams noted that Timmon had a grant for a television show in which she indicated her support for City Council candidate John Pollard.  Mr. Williams asked whether the grant was ill-advised.  He then noted that Timmon, along with two other individuals, failed to stand for the pledge of allegiance.  The City Council did not invoke Rule 19 against Mr. Williams.  The fifth speaker was Shirley Carter, an African-American, who, during the September 12, 2005, meeting, thanked the City Council for applying Rule 19 and noted that she herself had been subjected to personal attacks, apparently by Timmon.  The last speaker was Dru Vincent, an African-American.  Mr. Vincent, apparently referring to another speaker, called the speaker a "racist pig."  When Defendant Allen reminded Mr. Vincent of Rule 19, Mr. Vincent expressed his view that the City Council applied the rules in a racist manner.

At most, Timmon's evidence shows that the City Council applies Rule 19 in a nondiscriminatory manner.  Defendant Allen applied the rule to Jim Williams, who is Caucasian, and to Timmon and Mr. Vincent, both of whom are African-American, because their comments were of a personal nature.  Defendant Allen did not apply Rule 19 to Willy Williams or to Gary Andrews, both of whom are Caucasian, or to Frank S. Curtis X, who is African-American.  Neither Mr.

Andrews nor Mr. Curtis made any comments that could be characterized as personal attacks, and although Willy Williams did mention Timmon, his comments were arguably not personal attacks because they related to candidates in an upcoming election, grants for cable television programming, and who did not stand for the pledge of allegiance.

Similarly, Timmon's video evidence in Case No. 5:06-CV-7 does not show that Defendant Leeman applied Rule 19 to Timmon in a discriminatory manner. That evidence, detailed above in the statement of facts, shows that all of the other speakers commented upon issues that were both of concern to the public and related to City Council business. Willy Williams, who apparently is the Caucasian speaker to whom Timmon refers in her complaint, did mention Timmon in his comments. However, his remarks cannot be considered a personally-abusive attack because he merely purported to quote remarks that Timmon made on a recent television show on the City-sponsored cable channel regarding the mayor, Dunbar, and the choices that City of Lansing voters had made in the recent election. Accordingly, Timmon has failed to demonstrate any basis for an equal protection claim.

### 2.    Absolute Legislative and Qualified Immunity

As alternative bases for summary judgment, Defendants contend that they are entitled to absolute legislative or qualified immunity. In light of its conclusions that Defendants are entitled to summary judgment because Defendants did not violate Timmon's First and Fourteenth Amendment rights, the Court need not address Defendants' immunity arguments. See Feterle v. Chowdhury, 148 F. App'x 524, 533 (6th Cir. 2005) (finding it unnecessary to reach the question of qualified immunity in light of the conclusion that the plaintiff's First Amendment claim failed); Burnette v. Gee, 137 F. App'x 806, 812 (6th Cir. 2005) ("Because this Court finds that Sheriff Gee did not violate Wilson's Fourth Amendment right to be free of excessive force, it need not address Appellants' arguments regarding qualified immunity.")

**B.    Claims Under 18 U.S.C. §§ 241 and 242 (Case No. 5:05-CV-127)**

Defendants also contend that Timmon's claims under 18 U.S.C. §§ 241 and 242 must be dismissed because those statutes are criminal statutes that do not provide a civil right of action to private parties. It is well-established that criminal statutes, such as §§ 241 and 242, can only be enforced by the United States as prosecutor. See, e.g., Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81, 86 (2d Cir. 1972) ("It is a truism, and has been for many decades, that in our federal system crimes are always prosecuted by the Federal Government, not as has sometimes been done in Anglo-American jurisdictions by private complaints."); Winslow v. Romer, 759 F. Supp. 670, 673 (D. Colo. 1991) ("Private citizens generally have no standing to institute federal criminal proceedings."). Moreover, courts have specifically held that "[o]nly the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241-242 (the criminal analogue of 42 U.S.C. § 1983)." Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989) (per curiam); see also Bernal v. Kline, No. Civ. A. 04-3457-GTV, 2005 WL 1109453, at *2 (D. Kan. May 9, 2005) ("To the extent plaintiff seeks damages based on defendants' alleged violation of 18 U.S.C. §§ 241 and 242, plaintiff has no standing to assert jurisdiction under these federal criminal statutes which neither authorize civil actions nor create civil liabilities on the part of any defendant."); Copley v. Sweet, 133 F. Supp. 502, 505-06 (W.D. Mich. 1955) (stating that §§ 241 and 242 "provide only for punishment by fine or imprisonment for the deprivation of certain Federal rights, privileges or immunities therein referred to, and it is clear that they have no application to the plaintiff's present civil action for money damages"). Therefore, Timmon lacks standing to assert claims under §§ 241 and 242.[8]

---

[8]Incidentally, even if Timmon had standing to enforce those sections, any claim would fail, as the Court has already determined that Defendants did not violate Timmon's constitutional rights.

### C.      Open Meetings Act Claim

Timmon also appears to assert a claim under the Open Meetings Act ("OMA").  The basis of her claim is unclear.  In her complaint in Case No. 5:05-CV-127, Timmon cites § 3(5) of the OMA, which provides, in part: "A person shall be permitted to address a meeting of a public body under rules established and recorded by the public body. . . ."  M.C.L. § 15.263(5).  Timmon was permitted to address the City Council at its September 12, 2005, meeting and at its January 6, 2006, meeting, subject to its established rules.  She fails to explain how Defendants violated this provision.  In her brief in support of her motion for summary judgment in Case No. 5:05-CV127, Timmon asserts that Wood and Allen violated the OMA by passing notes between themselves and the City Attorney that were not known to the other City Council members.  Timmon contends that "[t]he notes were in violation of the Open Meetings Act that prohibits voting procedures that the public is not aware of."  (Pl.'s Br. Supp. Mot. at 7.)  Apart from the fact that Timmon has not submitted the alleged notes to the Court for its review, Timmon fails to cite any authority for the proposition that notes passed between members of a governmental body during a meeting somehow constitute voting, a decision of the body, or deliberations of the body.  In any event, nothing in the videotape of the September 12, 2005, meeting shows that the City Council took any official action based upon or because of the alleged notes.  Accordingly, Defendants are entitled to summary judgment on this claim.[9]

---

[9]Timmon also references various provisions of the Lansing City Charter in her brief in support of her motion for summary judgment.  The purpose of such references is not clear to the Court.  A violation of the City Charter would not amount to a violation of a federal constitutional right, because "[v]iolations of state law do not, by themselves, give rise to a federal cause of action under 42 U.S.C. § 1983."  Jocham, 239 F. Supp. 2d at 729.  Moreover, Timmon fails to cite any basis for concluding that she has any state law claim based upon a violation of the City Charter.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' motions for summary judgment

on all claims in both cases and deny Timmon's motions for summary judgment in both cases.

An Order consistent with this Opinion will be entered.


Dated:  July 18, 2006                              /s/ Gordon J. Quist
                                          GORDON J. QUIST
                                  UNITED STATES DISTRICT JUDGE